IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

RIANNA MIDKIFF and           )
NICOLE JONES,                 )
                             )
        Plaintiffs,           )
                             )          1:24-cv-858
    v.                        )
                             )
SHOE SHOW, INC.,              )
                             )
        Defendant.            )

**MEMORANDUM OPINION AND ORDER**

**OSTEEN, JR., District Judge**

Before this court is Defendant Shoe Show, Inc.'s Motion to Dismiss. (Doc. 16.) Pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, Defendant moves to dismiss all claims in Plaintiffs Rianna Midkiff and Nicole Jones' Consolidated Class Action Complaint, (Doc. 12). (Doc. 16.) For the reasons stated herein, Defendant's motion will be granted in part and denied in part.

**I.   FACTUAL BACKGROUND**

This is a data breach case. Plaintiffs are two individuals, Rianna Midkiff and Nicole Jones ("Plaintiffs"), whose personally identifiable information ("PII") was compromised when the computer system on which it was stored was accessed by an unauthorized party. (Doc. 12 ¶¶ 1, 3-5, 9-10, 62-64, 74, 80-84.)

The owner of that breached computer system is Defendant Shoe Show, Inc. ("Defendant"), a North Carolina corporation. (See id. ¶¶ 3-5, 11.) Plaintiff Rianna Midkiff ("Midkiff") is a resident of Arkansas, (id. ¶ 9), and Plaintiff Nicole Jones ("Jones") is a resident of North Carolina, (id. ¶ 10). Plaintiffs bring this action, individually and on behalf of all others similarly situated, against Defendant and allege five causes of actions arising from the breach. (Id. at 1, 21-31.)[1]

On June 28, 2024, an unauthorized party gained access to the email account of one of Defendant's employees. (Id. ¶¶ 4-5; Doc 12-1.) The unauthorized party retained access for approximately a week, until July 6, 2024. (Doc. 12 ¶¶ 5-6; Doc. 12-1.) The breached employee email account contained, or provided access to, the unencrypted PII of approximately 12,856 individuals. (See Doc. 12 ¶¶ 2 & n.2, 3-5, 15; Doc. 12-1.) After Defendant discovered the breach around August 15, 2024, it took steps to investigate the breach. (See Doc. 12-1.) Fifty-five days later, on October 9, 2024, Defendant notified by letter the individuals whose PII had been compromised by the breach. (See id.; Doc. 12 ¶¶ 2 & n.2, 3-4.) Plaintiffs were among those who

---

[1] All citations in this Memorandum Opinion and Order to documents filed with the court refer to page numbers located at the bottom right-hand corner of the documents as they appear on CM/ECF.

- 2 -

received Defendant's Breach Notification Letter. (Doc. 12 ¶¶ 3-4.)

Defendant informed Plaintiff Midkiff that her "name, coupled with [her] Social Security number" had been exposed by the breach. (Doc. 12-1.) Defendant had acquired this information when Midkiff "provided [it] to Defendant as a condition of her employment with Defendant." (Doc. 12 ¶¶ 62-63.) Following the breach, Midkiff experienced problems that Plaintiffs attribute to the breach. (See id. ¶¶ 65-69.) First, as suggested by the notification letter, "Midkiff attempted to sign up for credit monitoring services but was unable to because she was told her credit had been locked due to suspicious activity." (Id. ¶ 65; see Doc. 12-1.) This caused Midkiff to "spend significant time and effort to unlock her credit," "regain control of her credit, which has been lost, and to restore her ability to use her credit." (Doc. 12 ¶¶ 66-67.) Second, "a malicious third party hacked the same [G]mail account that Plaintiff Midkiff used to communicate with Defendant during her employment in-processing." (Id. ¶ 68.) The hacker "used her account to send emails," and though she was able to regain control of the account, it was subsequently "flooded with a significant amount of spam and phishing messages," some of which were "graphic and offensive in

- 3 -

nature." (Id.) This caused Midkiff to have to change her email address. (Id.)

Plaintiff Jones was similarly informed by Defendant that her PII had been exposed by the breach. (Id. ¶¶ 3-4, 80, 82.) Defendant had "acquired Plaintiff Jones' [p]rivate [i]nformation . . . , including her Social Security number and financial account information" before the breach and, according to Plaintiffs "[o]n information and belief, [Defendant] used Plaintiff Jones' [p]rivate [i]nformation to facilitate its business and profits." (Id. ¶¶ 74-75.) Plaintiffs allege that "Jones has suffered . . . anxiety, sleep disruption, stress, fear, and frustrations" because of the breach. (Id. ¶ 86.)

Defendant continues to retain Plaintiffs' PII. (Id. ¶¶ 72, 90.) Plaintiffs allege that they face "substantially increased risk of fraud, identity theft, and misuse" because of the breach, (id. ¶¶ 71, 88), and, as a result, they "anticipate[] spending considerable time and money . . . to try to mitigate" these risks, (id. ¶¶ 73, 89). Plaintiffs describe how their concerns about loss of privacy cause them stress and anxiety. (Id. ¶ 70; see id. ¶¶ 84, 86.)

## II.  PROCEDURAL HISTORY

This case is the consolidation of two related cases: Midkiff v. Shoe Show, Inc., No. 1:24-cv-858, and Jones v. Shoe

- 4 -

Show, Inc., No. 1:24-cv-859. On October 17, 2024, Plaintiff Midkiff filed a Complaint against Defendant on behalf of herself and all others similarly situated. (Doc. 1.) On that same day, Plaintiff Jones separately filed a Complaint against Defendant on behalf of herself and all others similarly situated. Class Action Compl., Jones v. Shoe Show, Inc., No. 1:24-cv-859 (M.D.N.C. Oct. 17, 2024). Plaintiffs moved to consolidate their cases on November 13, 2024, (Doc. 7), and their motion was granted on November 15, 2024, (Doc. 11). Plaintiffs then filed an amended Consolidated Class Action Complaint, (Doc. 12), on December 2, 2024. Defendant responded with a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), (Doc. 16), and memorandum in support of their motion, (Doc. 17), on January 22, 2025. Plaintiffs filed a response in opposition to Defendant's motion, (Doc. 19), on February 21, 2025, and, on March 14, 2025, Defendant filed a reply, (Doc. 20).

III. **STANDARD OF REVIEW**

    A. **12(b)(1)**

A motion pursuant to Rule 12(b)(1) challenges the existence of subject-matter jurisdiction. See Fed. R. Civ. P. 12(b)(1). A defendant may challenge subject-matter jurisdiction facially or factually. See Kerns v. United States, 585 F.3d 187, 192 (4th Cir. 2009). In a facial challenge, a defendant asserts that the

- 5 -

allegations, taken as true, are insufficient to establish subject-matter jurisdiction. See id. The court then effectively affords a plaintiff "'the same procedural protection as he would receive under a rule 12(b)(6) consideration,'" taking the facts as true and denying the Rule 12(b)(1) motion if the complaint "alleges sufficient facts to invoke subject matter jurisdiction." Id. (quoting Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982)). In a factual challenge, a defendant asserts that the jurisdictional allegations are false, and the court may look beyond the complaint to resolve the disputed jurisdictional facts without converting the motion to one for summary judgment. Id. at 192-93.

**B.    12(b)(6)**

A motion pursuant to Rule 12(b)(6) challenges the legal sufficiency of the facts alleged in the complaint. Francis v. Giacomelli, 588 F.3d 186, 192 (4th Cir. 2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). To be facially plausible, a claim must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable" and must demonstrate "more than a

- 6 -

sheer possibility that a defendant has acted unlawfully." Id. (citing Twombly, 550 U.S. at 556). When ruling on a motion to dismiss, a court must accept the complaint's factual allegations as true. Id. Further, a court must "draw all reasonable inferences in favor of the plaintiff." Ray v. Roane, 948 F.3d 222, 226 (4th Cir. 2020) (citation omitted).

Nevertheless, sufficient factual allegations must "raise a right to relief above the speculative level" so as to "nudge[] the[] claims across the line from conceivable to plausible." Twombly, 500 U.S. at 555, 570; see Iqbal, 556 U.S. at 680. Consequently, even given the deferential standard allocated to pleadings at the motion to dismiss stage, a court will not accept mere legal conclusions as true and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, [will] not suffice." Iqbal, 556 U.S. at 678.

## IV. **ANALYSIS**

### A. **Standing**

Defendant contends that Plaintiffs' Consolidated Class Action Complaint should be dismissed pursuant to Rule 12(b)(1) because Plaintiffs fail to allege facts sufficient to establish Article III standing. (Doc. 17 at 10-11.) Specifically, Defendant argues that "Plaintiffs fail to allege any actual

- 7 -

injury traceable to the security incident," that is, the breach of Defendant's employee email account on which Plaintiff's PII was stored. (Id. 14-15.) As this constitutes a facial challenge to subject-matter jurisdiction, this court accepts as true the complaint's well-pleaded factual allegations and draws all reasonable inferences in favor of Plaintiffs. See Beck v. McDonald, 848 F.3d 262, 270 (4th Cir. 2017) (quoting Adams, 697 F.2d at 1219).

Standing is an element of Article III's case-or-controversy requirement for federal court jurisdiction. Clapper v. Amnesty Int'l, 568 U.S. 398, 408 (2013); Spokeo, Inc. v. Robins, 578 U.S. 330, 337-38 (2016). The doctrine of standing "ensure[s] that federal courts do not exceed their authority as it has been traditionally understood." Spokeo, 578 U.S. at 338. A plaintiff bears the burden of establishing standing, and to do so, the plaintiff must clearly allege facts demonstrating each of three elements: "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Id.; Hutton v. Nat'l Bd of Exam'rs in Optometry, Inc., 892 F.3d 613, 619 (4th Cir. 2018). When evaluating a class action complaint, a court "analyze[s] standing based on the allegations of personal injury made by the

- 8 -

named plaintiffs." <u>Hutton</u>, 892 F.3d at 620 (quoting <u>Beck</u>, 848 F.3d at 269). Class plaintiffs cannot meet their burden to establish standing "[w]ithout a sufficient allegation of harm to the named plaintiff in particular," but when a court evaluates a complaint at the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." <u>Id.</u> (first quoting <u>Beck</u>, 848 F.3d at 269, then quoting <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 561 (1992)).

Here, Defendant contends that Plaintiffs' allegations fail to establish the injury-in-fact and traceability elements of Article III standing. (Doc. 17 at 14–15.) "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" <u>Spokeo</u>, 578 U.S. at 339 (quoting <u>Lujan</u>, 504 U.S. at 560). To establish traceability, a plaintiff's factual allegations must plausibly show a "fairly traceable" connection between the alleged injury and a defendant's alleged conduct. <u>Beck</u>, 848 F.3d at 269. However, the "fairly traceable standard is not equivalent to a requirement of tort causation." <u>Hutton</u>, 892 F.3d at 623 (quoting <u>Friends of the Earth, Inc. v. Gaston</u>

- 9 -

Copper Recycling Corp., 204 F.3d 149, 161 (4th Cir. 2000)). A trio of Fourth Circuit cases — Beck v. McDonald, Hutton v. National Board of Examiners in Optometry, Inc., and Holmes v. Elephant Insurance Company — guide the analysis of injury in fact and traceability in a data breach case such as this.

In Beck, the Fourth Circuit considered the consolidated appeals of plaintiffs who sued a medical center after two data breaches at the medical center compromised their personal information. 848 F.3d at 266-67. One set of plaintiffs' claims arose from the theft of one of the center's laptops, which contained their unencrypted PII, including names, birth dates, the last four digits of social security numbers, and physical descriptors. Id. at 267. The other set of plaintiffs' claims arose from the theft or misplacement of four boxes of medical records that contained their PII, including names, social security numbers, and medical diagnoses. Id. at 268. Both sets of plaintiffs alleged injury in fact based on "increased risk of future identity theft and the cost of measures to protect against it." Id. at 266-67.

Affirming the district court's dismissals of the two cases for lack of standing, the Fourth Circuit held that the plaintiffs' alleged increased risk was "too speculative to constitute an injury-in-fact" because the plaintiffs failed to

- 10 -

show that the PII on the stolen laptop or the missing boxes had been accessed or misused or that they suffered identity theft. Id. at 274–75. The court explained that recognizing Plaintiffs' asserted injury in fact would require it to engage in an "attenuated chain of possibilities." Id. at 275 (quoting Clapper, 568 U.S. at 410). The court would have to "assume that the thief targeted the stolen items for the personal information they contained" and further assume "the thieves . . . [will] then select, from thousands of others, the personal information of the named plaintiffs and attempt successfully to use that information to steal their identities." Id. Thus, the court held, "the mere theft of these items, without more, cannot confer Article III standing." Id.; see also Hutton, 892 F.3d at 621.

A year later, in Hutton, the Fourth Circuit explained what was sufficient alongside the fact of a data breach to constitute injury in fact. See 892 F.3d at 621–22. There, the court considered the consolidated appeals of plaintiff-optometrists who sued the National Board of Examiners of Optometry ("NBEO") after their PII was compromised by a breach of the NBEO database on which it was stored. Id. at 616–17. NBEO had acquired their PII, including social security numbers, names, dates of birth, addresses, and credit card information, when the plaintiffs

- 11 -

registered with NBEO to take professional board certification exams. Id. at 617. In addition to alleging an increased risk of identity theft and the cost of measures to mitigate that risk, the plaintiffs alleged that unauthorized parties had opened or attempted to open credit cards in their names after the breach. Id. at 622.

Reversing the district court's dismissals for lack of standing, the Fourth Circuit held that "[a]t minimum, the [p]laintiffs have sufficiently alleged an imminent threat of injury to satisfy Article III standing." Id. at 622. Distinguishing Beck, the court described its holding there as "emphasiz[ing] that a mere compromise of personal information, without more, fails to satisfy the injury-in-fact element in the absence of an identity theft." Id. at 621. Unlike the Beck plaintiffs who alleged only "a compromise of personal information," the Hutton plaintiffs alleged that they "ha[d] already suffered actual harm in the form of identity theft and credit card fraud." Id. 621–22. That is, the plaintiffs' factual allegations about an unknown third-party opening credit cards in their names after the breach showed that "their data has been stolen, accessed, and used in a fraudulent manner." Id. at 622. This in itself constituted sufficient injury in fact, and it plausibly established "a substantial risk of harm actually

- 12 -

exists" such that "the costs of mitigating measures to safeguard against future identity theft" was no longer too speculative to constitute injury in fact. See id.

Moving from injury in fact to traceability, the Fourth Circuit held that the plaintiff-optometrists had established a fairly traceable connection between the alleged injury and NBEO's alleged conduct because plaintiffs' complaints "contained sufficient allegations that the NBEO was a plausible source of the [p]laintiffs' personal information" that was fraudulently used. Id. at 623-24. Specifically, the factual allegations that the court found significant to this determination were: (a) fraudulent credit cards were applied for using the former surnames (maiden name and former married name) of two plaintiffs who had provided NBEO with those names years earlier; (b) the third named plaintiff "was informed by a credit monitoring service of an effort to open a fraudulent credit card account in her name, using personal information she had previously provided to the NBEO" several years earlier; and (c) "other national optometry organizations do not gather or store Social Security numbers, or have investigated and confirmed that their databases have not been breached." Id. at 623. Thus, the court reasoned, the plaintiffs plausibly alleged that, "amongst the group of optometrists, the NBEO is the only common source that collected

- 13 -

and continued to store social security numbers that were required to open a credit card account, and also stored outdated personal information . . . during the relevant time periods." Id.

Just last year, the Fourt Circuit returned to the topic of standing in data breach cases in Holmes v. Elephant Insurance Company, 156 F.4th 413 (4th Cir. 2025). There, consolidated plaintiffs were four individuals, suing on behalf of themselves and all others similarly situated, who alleged that hackers used the auto-populate function of defendant Elephant Insurance Company's ("Elephant") online quoting platform to acquire their driver's license numbers, which constitutes personally identifiable information ("PII"). 156 F.4th at 419. The Fourth Circuit reversed in part the trial court's dismissal for lack of Article III standing, holding that "a subset of the plaintiffs ha[d] standing to continue their suit on one of their alleged injuries." Id. Specifically, that "subset" with sufficient standing were two plaintiffs who "allege[d] that they found their driver's license number listed on the dark web and attribute the listings to the Elephant breach." Id. at 425-26. However, with respect to the other two plaintiffs, who did not allege that the hackers shared their driver's license numbers on the dark web or with anyone else, the Fourth Circuit affirmed in

- 14 -

part the lower court's dismissal for lack of standing. Id. at 419, 425.

To reach this conclusion, the Fourth Circuit articulated and applied a "tradition" test to determine whether, in the data breach context, an alleged intangible harm is sufficiently "concrete" to satisfy the injury-in-fact component of standing. See id. at 421–25. Based on the proposition that, "[t]o be sufficiently concrete, an intangible harm must bear 'a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts,'" the court reasoned that "we must assess whether there is a 'close historical or common-law analogue' to [the alleged injury], though the analogue need not be 'an exact duplicate.'" Id. at 421 (quoting TransUnion LLC v. Ramirez, 594 U.S. 413, 424–25 (2021)). Under this test, the court found two plaintiffs' allegations that the hackers published their driver's license numbers on the dark web analogous to the common-law tort of public disclosure of private information. Id. at 425–26.

> [W]e hold that the public disclosure of private information tort makes concrete the intangible harm suffered when information that the plaintiff would justifiably prefer to tightly control is released into the open. Though the information need not be embarrassing or salacious, the plaintiff must have good reason to keep it close to the vest. And though the information need not be broadcast to the whole world, it must be accessible to many.

- 15 -

Id. at 425. Thus, by alleging that their driver's license numbers, "information they justifiably prefer to tightly control," had been listed on the dark web, "a forum accessible to all — or at least to those with some degree of proficiency with computers," the two plaintiffs alleged a concrete injury analogous to the tort of public disclosure, and, therefore, they "show[ed] a concrete injury in the eyes of Article III." Id. at 425-26.

In contrast, the other two Holmes plaintiffs failed to "provide any reason to think that their driver's license numbers are now generally accessible" because they did "not allege that the unnamed hackers are so numerous as to constitute the public on their own" or "that the hackers have shared their driver's license number with anyone else." Id. at 425. In other words, they did not allege that their driver's license numbers were disclosed to the public. See id. Therefore, because their injury "[did] not bear a close relationship to the harm addressed by the public-disclosure tort," they did not allege a concrete injury. Id.

The court also addressed the plaintiffs' three other allegations of injury-in-fact: (1) "the risk of future misuse of their personal information by other malicious actors"; (2) "the risk of having their personal information taken again in the

- 16 -

future in another hack of Elephant"; and (3) "the emotional distress and time spent monitoring their financial records to mitigate the likelihood of future harm." Id. at 421, 428-35. First, the court held that the allegation of "risk of future misuse" failed because plaintiffs did not establish the "imminence" of such harm. Id. at 428-30. Significant to this holding was: (a) with respect to the two plaintiffs who did not allege publication of their PII, "[t]he fact that other members of the class already had their information disseminated was not enough to establish imminence," id. at 429-30; and (b) beyond publication on the dark web, none of the plaintiffs had alleged actual misuse of their PII (e.g., fraudulent impersonation), id. at 430-32.

Second, the court held that the allegation of injury through a future hack of Elephant also failed because of insufficiently established "imminence." Id. at 432-33. That is, because plaintiffs failed to show why hackers would again target Elephant or how their PII would be compromised in a future data breach of Elephant, "the possibility of being subject to another data breach is insufficiently imminent here." Id. at 433. Third, the court held that plaintiffs' allegation of emotional stress and mitigation costs failed insofar as it was asserted as a separate or stand-alone injury-in-fact. Id. at 434-35. "[W]e

- 17 -

hold that if time spent and emotional distress felt are concrete injuries, they may serve as the sole basis for standing to recover damages only when incurred in response to a separate imminent harm. They do not suffice for standing on their own." Id. at 435. Thus, because the two plaintiffs who did not allege publication of their PII on the dark web "failed to allege any imminent harm," they "lack[ed] standing to recover damages for any time spent or emotional distress felt too." Id. The two plaintiffs who did allege publication of their PII, however, may be able to recover damages for emotional distress and mitigation efforts, but they cannot establish standing from those allegations. Id. at 434 & n.24.

It appears to this Court that the Fourth Circuit's opinion in Holmes does not substantially change the legal framework previously set out in Beck and Hutton. Holmes cites approvingly to, and relies upon, both cases in its analysis. See 156 F.4th at 429 n.18, 430–32. Beck, Hutton, and Holmes appear to cumulatively hold the following. A data breach plaintiff must allege more than the mere fact of the breach to establish injury-in-fact. Beck, 848 F.3d at 275; see also Hutton, 892 F.3d at 621–22. A plaintiff's plausible allegation of actual misuse of PII — that "their data has been stolen, accessed and used in a fraudulent manner," Hutton, 892 F.3d at 622 — establishes

- 18 -

injury-in-fact since "having one's identity fraudulently misrepresented[] is concrete because it either inflicts a tangible injury or will inflict an intangible injury that is on all fours with the common-law tort of appropriation of another's name or likeness," Holmes, 156 F.4th at 429 n.18 (internal citations omitted) (citing Hutton, 892 F.3d at 622; Restatement (Second) of Torts § 652C). Further, such an allegation of actual misuse may also show that "a substantial risk of harm actually exists" such that "the costs of mitigating measures to safeguard against future identity theft" is no longer too speculative to constitute injury in fact. See Hutton, 892 F.3d at 622; see also Holmes, 156 F.4th at 434 n.25 ("It may . . . be that mitigation cost is a unique kind of injury such that a plaintiff cannot plead it alone — that mitigation costs must connect with a second injury to be an injury-in-fact." (citing Hutton, 892 F.3d at 622)). Finally, where a data breach plaintiff alleges only a publication or dissemination, such an intangible injury must be analogous to a harm actionable at common law to establish standing. See Holmes, 156 F.4th at 421–25.

Though Defendant's 12(b)(6) motion is a close call in some respects, this case falls nearer to Hutton than Beck. Like Hutton, Plaintiffs allege more than the mere factual occurrence of breach and a resultant heightened risk of identity theft and

- 19 -

fraud. Plaintiff Midkiff sets forth allegations of actual misuse of her PII: first, when Midkiff attempted to sign up for credit monitoring following notification of the breach, she "was unable to because she was told her credit had been locked due to suspicious activity," (Doc. 12 ¶ 65); second, at an unspecified time after the breach, an unknown third party hacked Midkiff's Gmail account and used it to send emails, (id. ¶ 68); and, third, when Midkiff regained control of her Gmail account, she experienced an increase of spam and phishing emails, some of which were graphic or offensive, (id.). Courts in this circuit have previously recognized similar factual allegations as showing actual misuse sufficient for standing. See, e.g., Capiau v. Ascendum Mach., Inc., No. 24-cv-142, 2024 WL 3747191, at *4 (W.D.N.C. Aug. 9, 2024) (plaintiff's increased receipt of spam emails, texts, and calls from certain actors post-breach showed actual misuse of his PII due to the breach); Solomon v. ECL Grp., LLC, No. 22-CV-526, 2023 WL 1359662, at *4 (M.D.N.C. Jan. 31, 2023) (same); Gordon v. Zeroed-In Tech., LLC, No. 23-cv-3284, 2025 WL 936415, at *5–6 (D. Md. Mar. 26, 2025) (actual misuse where plaintiffs saw suspicious activity on one plaintiff's credit report and her credit card, and where Experian notified another plaintiff that her Social Security number was available on the dark web and that it had been found

- 20 -

in association with an unknown address); <u>In re Retina Grp. of Wash. Data Sec. Litig.</u>, No. 24-cv-0004, 2025 WL 2030241, at *4 (D. Md. July 21, 2025) (actual misuse where one plaintiff received notices from financial institutions that her account information may have been tampered with or compromised and she received multiple targeted phishing emails, and where another plaintiff's credit score was damaged and she experienced increased spam).

Defendant contends that Plaintiffs' allegations of actual misuse fail to establish standing because they are not fairly traceable to the breach. (Doc. 17 at 16–17.) First, Defendant argues that neither the alleged hack of Plaintiff Midkiff's Gmail account nor the subsequent increase in spam and phishing emails are traceable to the breach because those misuses could not have resulted from the type of PII compromised by the breach. (<u>See</u> <u>id.</u> at 17; <u>see also</u> Doc. 20 at 10.) According to Defendant, though Plaintiffs allege that Midkiff's name and Social Security number were compromised in the breach, their Complaint does not allege that her email address and password were compromised, and, therefore, "the alleged Gmail hack and spam emails have no tie to the security incident." (Doc. 17 at 17.)

- 21 -

On this point, Defendant's characterization of the content of Plaintiffs' complaint is only half-correct: while Plaintiffs nowhere allege that Midkiff's Gmail password was among the PII exposed in the breach, they do plausibly allege that the breach exposed Midkiff's Gmail address. (See Doc. 12 ¶¶ 62, 68 (alleging the Gmail account that was hacked and then "flooded" with spam and phishing emails was the same account that Midkiff had used to provide Defendant her name and Social Security number).) Further, Plaintiffs' Complaint describes how cybercriminals can use only a couple pieces of PII — in particular, a Social Security number — to "piece together full pictures of [a] victim's information to perpetuate even more types of attacks." (See id. ¶¶ 50–52 & n.12.) Therefore, this court is not persuaded at this stage in the proceedings by Defendant's argument that there is no sufficient connection between the alleged actual misuse of Midkiff's Gmail account and the breach of Defendant's computer system because Midkiff's Gmail password was not directly disclosed in the breach. See Gordon, 2025 WL 936415, at *10 (finding unpersuasive the "argument that fraudulent activity related to credit cards and bank accounts severs traceability because that information was not directly disclosed during the Data Breach" and noting "[c]ourts have repeatedly acknowledged the heightened risk of

- 22 -

harm given the sensitive nature of Social Security numbers and the increased risk of misuse" (citing Chamblis v. Carefirst, Inc., 189 F. Supp. 3d 564, 570 (D. Md. 2016); McMorris v. Carlos Lopez & Assocs., LLC, 995 F.3d 295, 302 (2d Cir. 2021))); see also In re Blackbaud, Inc., Customer Data Breach Litig., No. 20-mn-02972, 2021 WL 2718439, at *9 (D.S.C. July 1, 2021).

Second, Defendant claims Plaintiffs' allegation that Midkiff's credit was "locked" due to suspicious activity after the breach is too vague to plausibly show a misuse traceable to the breach. (See Doc. 17 at 17–18; Doc. 20 at 9.) Specifically, Defendant argues in its reply brief that it is impossible to determine what Plaintiffs mean by "credit had been locked" — whether this language refers to a "credit file security freeze" or a "credit lock" service, each of which requires a request by the consumer to put in place — and, "[i]n any event, the 'credit lock' has no alleged tether to [the breach] beyond a pure coincidence in timing, which is insufficient." (Doc. 20 at 9.)

As previously stated, this court must accept as true any well-pleaded factual allegation and construe the Complaint in the light most favorable to the Plaintiffs. Hutton, 892 F.3d at 620. Viewed in this light, Plaintiffs plausibly allege, at minimum, that Defendant's breach notification letter encouraged Midkiff to sign up for a credit monitoring service, (Doc. 12-1),

- 23 -

and when Midkiff went to do so, she received notice about suspicious activity involving her credit, (see Doc. 12 ¶ 65). This is sufficient to show actual misuse. See Gordon, 2025 WL 936415, at *5-6; In re Retina Grp. of Wash., 2025 WL 2030241, at *4. Further, Plaintiffs allege more than a "pure coincidence in timing" between the breach and the reported suspicious credit activity. (Doc. 20 at 9.) The connection between an individual's Social Security number and his or her credit is well-known. See Ostergren v. Cuccinelli, 615 F.3d 263, 278-79 (4th Cir. 2010) (discussing the "ubiquitous" usage of SSNs by financial institutions, among others, for account identification and authentication). Thus, a reasonable inference arises from the factual allegations that Midkiff learned of suspicious activity involving her credit after the breach compromised her name and Social Security number: someone took that PII from the breach and used it to try to tap into Midkiff's credit. This constitutes a sufficient connection to satisfy the "relatively modest" requirement of traceability. See In re Blackbaud, 2021 WL 2718439, at *8-9 (quoting Bennett v. Spear, 520 U.S. 154, 170-71 (1997)); see also Gordon, 2025 WL 936415, at *9-10.

Third, Defendant argues that Plaintiffs fail to allege that Plaintiff Jones suffered any actual misuse of her PII. (Doc. 17 at 16; Doc. 20 at 9.) Defendant is correct; the Complaint

- 24 -

alleges only that Jones experienced emotional and psychological harm and faces an increased risk of fraud and identity theft because of the breach. (See Doc. 12 at ¶¶ 74-90.) Such allegations alone are insufficient to establish injury in fact. Beck, 848 F.3d at 272-75. But these allegations do not stand alone. As other courts in this circuit have found, in a consolidated complaint where one plaintiff alleges actual misuse of his or her PII after a data breach and a second plaintiff alleges only the increased threat of harm because of the breach, the first plaintiff's allegation of actual misuse "suffice[s] to push the threatened injury of future identity theft beyond the speculative to the sufficiently imminent" such that the second plaintiff has established injury-in-fact. Gordon, 2025 WL 936415, at *6 (cleaned up) (quoting In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig., 440 F. Supp. 3d 447, 460 (D. Md. 2020)); In re Retina Grp. of Wash., 2025 WL 2030241, at *4; Farley v. Eye Care Leaders Holding, LLC, 22-CV-468, 2023 WL 1353558, at *4 (M.D.N.C. Jan. 31, 2023). In other words, one plaintiff's allegation of actual harm can serve to show that "a substantial risk of harm actually exists" for another plaintiff. See Hutton, 892 F.3d at 622; In re Marriott, 440 F. Supp. 3d at

- 25 -

459-60.[2] Accordingly, this court finds that Plaintiffs have sufficiently established injury-in-fact with respect to Plaintiff Jones; the allegations of actual misuse of Midkiff's PII, (see Doc. 12 ¶¶ 64, 68), make the threatened injury of future identity theft and fraud to Jones, a similarly situated Plaintiff, (see id. ¶¶ 80-84, 86-89), sufficiently imminent to establish standing.

Holmes does not compel different conclusions. First, unlike the plaintiffs in Holmes, Plaintiff Midkiff alleges actual misuse of her PII. (See Doc. 12 ¶¶ 65, 68.) Specifically, Plaintiffs allege (a) when Midkiff attempted to sign up for credit monitoring following notification of the breach, she "was unable to because she was told her credit had been locked due to suspicious activity," (id. ¶ 65); (b) at an unspecified time after the breach, an unknown third party hacked Midkiff's Gmail account and used it to send emails, (id. at ¶ 68); and (c) when Midkiff regained control of her Gmail account, she experienced an increase of spam and phishing emails, some of which were graphic or offensive, (id.). Though barebones, these factual allegations plausibly establish fraudulent use of Midkiff's PII

---

[2] This court finds the reasoning of these courts persuasive because the actual harm to one Plaintiff from the breach creates a reasonable inference of imminent risk of actual harm to similarly situated Plaintiffs.

- 26 -

that "is concrete because it either inflicts a tangible injury,"
harm to Midkiff's credit score, or an intangible injury that is
"on all fours with the common-law tort of appropriation of
another's name or likeness," using Midkiff's Gmail account to
send emails. Holmes, 156 F.4th at 429 n.18 (characterizing as a
tangible injury the "eleven point decrease in credit score from
a fraudulent credit card application" that was alleged, among
other harms, in Hutton, 892 F.3d at 622). In other words, with
respect to Midkiff's allegation of actual misuse, Hutton still
controls the analysis, and Holmes only supports finding
standing. Discovery may provide different answers regarding the
reasons for Midkiff's injury, but at this stage, accepting the
facts as true and drawing all reasonable inferences, this court
finds these sufficient.

Second, like the two plaintiffs that the Holmes court
found to have standing, Plaintiff Jones alleges that her PII
"has already been published — or will be published imminently —
by cybercriminals on the Dark Web." (Doc. 12 ¶ 81.) Admittedly,
this allegation, which comes "on information and belief," does
not appear as strong as the two Holmes plaintiffs' allegation of
having found their PII on the dark web. See Holmes, 156 F.4th at
425–26 & n.10. However, several of Plaintiffs' other factual
allegations help strengthen and make more plausible Jones'

- 27 -

allegation of the publication of her PII. Where the Holmes plaintiffs alleged only that their driver's license numbers were compromised and published, Plaintiffs here allege that Jones' name, Social Security number, and financial account information were compromised, (see Doc. 12 ¶¶ 74, 81-82). As compared to a driver's license number, the sensitivity, permanency, and value of a Social Security number heighten the likelihood of publication or dissemination. See Holmes, 156 F.4th at 431 (discussing how driver's license numbers are impermanent and more easily changeable than many other forms of information; therefore, they are "part of, or close to, the category of 'less sensitive data' that 'does not pose the same risk of future identity theft or fraud to plaintiffs if exposed'" (quoting Beck, 848 F.3d at 275)). Further, the alleged actual misuse of Midkiff's PII helps substantiate the alleged publication of Jones' PII. See Gordon, 2025 WL 936415, at *6; In re Retina Grp. of Wash., 2025 WL 2030241, at *4; Farley, 2023 WL 1353558, at *4; cf. Holmes, 156 F.4th at 429-30 (holding that "[t]he fact that other members of the class already had their information disseminated was not enough to establish imminence," but acknowledging that other factual allegations, including allegations of actual misuse, may establish the "substantial risk" of injury necessary (emphasis added)). In other words,

- 28 -

though Jones cannot rely solely on Midkiff's allegation of actual misuse to confer standing to her, she need not do so as long as Plaintiffs plausibly "allege[] facts showing that information they justifiably prefer to tightly control," Jones' Social Security number, for example, "has been released into the open," that is, the dark web. Holmes, 156 F.4th at 426.

Thus, for the reasons discussed above, this court finds that Plaintiffs have sufficiently alleged injury in fact and traceability to establish Article III standing at the pleading stage.

## B. Failure to State a Claim

Defendant contends that North Carolina law governs Plaintiffs' claims and that, under North Carolina law, all those claims fail. (Doc. 17 at 23-24.) Plaintiffs do not directly address choice of law, but in their Complaint and brief, they implicitly accept that North Carolina law controls their claims, as they assert those claims and argue for their viability under, and with specific reference to, North Carolina law. (See Doc. 12 at 28-31; Doc. 19 at 13-24.)

This is a diversity-based complaint brought under the Class Action Fairness Act ("CAFA"). (Doc. 12 ¶ 12.) See 28 U.S.C. § 1332(d); Mell v. Anthem, Inc., 688 F.3d 280, 282 (6th Cir. 2012) (CAFA "extends the diversity jurisdiction of the federal

- 29 -

courts to certain class actions"); see also Johnson v. Advance Am., 549 F.3d 932, 938 (4th Cir. 2008) (describing CAFA as having "relaxed the requirements for demonstrating diversity jurisdiction" for interstate class action cases of national importance). "A federal court exercising diversity jurisdiction must apply the choice of law rules of the state in which it sits." Perini/Tompkins Joint Venture v. Ace Am. Ins. Co., 738 F.3d 95, 100 (4th Cir. 2013). Accordingly, this court must apply North Carolina choice of law rules to determine what substantive law governs Plaintiffs' claims.

North Carolina generally employs the traditional, lex loci approach to choice of law for contract, tort, and quasi-tort claims. See Boudreau v. Baughman, 322 N.C. 331, 335, 368 S.E.2d 849, 853-54 ("[North Carolina's] traditional conflict of laws rule is that matters affecting the substantial rights of the parties are determined by lex loci, the law of the situs of the claim . . . ."); see also SciGrip, Inc. v. Osae, 373 N.C. 409, 421, 838 S.E.2d 334, 343 (2020) (lex loci test for tort or tort-like claims); Bradshaw v. Bradshaw, 264 N.C. App. 669, 674, 826 S.E.2d 779, 783 (2019) (lex loci test for contracts). For tort or quasi-tort claims, under the rule of lex loci delicti, North Carolina courts apply the substantive law of the state where the injury occurred — that is, usually, the state "where the last

- 30 -

event necessary to make the actor liable or the last event required to constitute the tort takes place." Sci Grip, Inc., 373 N.C. at 420, 838 S.E.2d at 343 (quoting Harco Nat'l Ins. Co. v. Grant Thornton LLP, 206 N.C. App. 687, 695, 698 S.E.2d 719, 724 (2010). "For a contract claim, the governing law is determined by lex loci contractus, or the place where the contract was formed," which is "'the place at which the last act was done by either of the parties essential to a meeting of the minds.'" Eli Rsch., Inc. v. United Comms. Grp., LLC, 312 F. Supp. 2d 748, 754 (M.D.N.C. 2004) (quoting Key Motorsports, Inc. v. Speedvision Network, LLC, 40 F. Supp. 2d 344, 347 (M.D.N.C. 1999)).

Determining the place where the injury occurred or the place of contract formation can be a fact-intensive inquiry. Allen v. Novant Health, Inc., No. 22-CV-697, 2023 WL 5486240, at *1 (M.D.N.C. Aug. 24, 2023). At the motion to dismiss stage, a court may appropriately undertake a choice of law inquiry when the factual record is sufficiently developed. Taylor v. Walter Kidde Portable Equip., Inc., No. 21-cv-839, 2022 WL 4450271, at *5 (M.D.N.C. Sep. 23, 2022). However, "a court is typically in a better position to decide a choice of law issue after the parties have developed the factual evidence through the process of discovery." Clean Earth of Md., Inc. v. Total Safety, Inc.,

No. 10-CV-119, 2011 WL 1627995, at *4 (N.D.W. Va. Apr. 28, 2011). That is the case here.

In data breach cases such as this, courts applying North Carolina's choice of law approach, or a similar lex loci delicti rule, to tort claims at the motion to dismiss have concluded that "[p]laintiffs' alleged injury — and the last event necessary for [defendant company] to be potentially liable in tort — was the data being accessed by a third party" because "[t]he actual identity theft, emotional distress, and time and/or money spent to mitigate the harm all manifest from the initial injury — the exposure of [p]laintiffs' Private Information." In re Blackbaud, Inc., Customer Data Breach Litig., 567 F. Supp. 3d 667, 675 (D.S.C. 2021); see also Solomon, 2023 WL 1359662, at *5 (discussing and adopting the analysis of In re Blackbaud, Inc.); Lamie v. LendingTree, LLC, No. 22-cv-307, 2023 WL 1868198, at *3 (W.D.N.C. Feb. 9, 2023) (same); Capiau, 2024 WL 3747191, at *9 ("[T]he last act giving rise to [p]laintiff's alleged injuries occurred . . . where the data breach transpired."). Here, however, the pleadings do not

- 32 -

clearly indicate where the data breach took place.[3] Similarly,

with respect to an alleged actual or implied contract, the

pleadings do not clearly indicate where the last act essential

to a meeting of the minds occurred.[4] Faced with an insufficiently

developed factual record at the motion to dismiss stage, courts

have deferred a definitive resolution of the choice of law

question and applied the law of the place where the defendant

corporation is headquartered. See, e.g., In re Blackbaud, Inc.,

---

[3] Plaintiffs' Complaint is silent as to where the data breach occurred. (See Doc. 12.) Defendant contends that "the data breach affected data stored in North Carolina by a North Carolina company," and, therefore, this court should apply North Carolina law to Plaintiffs' tort claims. (Doc. 17 at 24–25.) First, this court is not obligated at this stage to accept as true Defendant's bare factual assertion about what servers Plaintiffs' PII was stored on or the location of those servers. Further, Defendant's argument is based on a misreading of the relevant case law as holding that the locus for data breach tort claims is the state where the relevant servers were located. (See Doc. 17 at 24.) Rather, and as discussed infra, in the cases upon which Defendant relies, courts faced with an insufficiently developed factual record applied the law of the state where the defendant corporation was headquartered for the limited purpose of deciding a motion to dismiss. See, e.g., Lamie, 2023 WL 1868198, at *3.

[4] For example, with respect to Plaintiff Midkiff, the Complaint alleges she provided her PII to Defendant as a condition of her employment. (Doc. 12 ¶ 62.) The Complaint further alleges that Midkiff is a resident of Arkansas, (id. ¶ 9), and Defendant is a North Carolina corporation, (id. ¶ 11), and it suggests that Midkiff's employment with Defendant was in Stuttgart, Arkansas, (id. ¶ 62). Thus, based on these facts, the last event essential to a meeting of the minds regarding the employment contract between Midkiff and Defendant — e.g., acceptance of an offer, see Lamie, 2023 WL 1868198, at *4 — could have occurred in Arkansas, or North Carolina, or an as-yet unidentified state.

567 F. Supp. 3d at 675–76; Lamie, 2023 WL 1868198, at *3; Solomon, 2023 WL 1359662, at *5. Like those courts, this court finds the factual record in the present case insufficiently developed such that definitive resolution of the choice of law question is inappropriate at this stage. Therefore, this court will defer that question until the record is further developed through the discovery process, and it will apply the law of North Carolina, the state where Defendant is headquartered, solely for the purposes of the instant motion to dismiss. This issue may be revisited later if warranted by subsequently developed facts.

### 1. Negligence & Negligence Per Se

"To state a negligence claim in North Carolina, [p]laintiff must allege that [d]efendant (1) owed [p]laintiff a duty; (2) breached that duty; (3) such breach caused [p]laintiff injury; and (4) that [p]laintiff suffered damages as a result." Capiau, 2024 WL 3747191, at *9 (citing Parker v. Town of Erwin, 243 N.C. App. 84, 110, 776 S.E.2d 710, 729–30 (2015)). Defendant contends that Plaintiffs' negligence claim fails because Plaintiffs only allege general, boilerplate allegations as to Defendant's information security practices or how Defendant's computer system was breached. (Doc. 17 at 11, 26–28.) In other words,

- 34 -

Defendant asserts that Plaintiffs have insufficiently alleged the "breach" element of their negligence claim.

This court agrees with Defendant that there are a number of conclusory allegations that fail to specify how Defendant breached its duty to protect information against intentional and unlawful data theft. However, Plaintiffs have provided specific failures on the part of Defendant in addition to those conclusory allegations. Plaintiffs allege Defendant kept their unencrypted PII, including their Social Security numbers, stored directly on, or accessible through, an employee email account, to which an unauthorized party then gained and retained access for a period of approximately six consecutive days without Defendant's detection. (See Doc. 12 ¶¶ 3-6, 15, 62-64, 68, 74, 80-82; Doc. 12-1.) This factual allegation of Defendant's actions in breach of its duty of care is sufficient to survive Defendant's 12(b)(6) motion. See Robertson v. Sea Pines Real Est. Cos., 679 F.3d 278, 291 (4th Cir. 2012) ("Iqbal and Twombly

- 35 -

do not require a plaintiff to prove his case in the complaint.").[5]

Defendant also asserts that Plaintiffs' negligence per se theory fails because the statute that Plaintiffs claim Defendant violated, Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, does not proscribe specific data security standards and it does not constitute a "public safety" statute. (Doc. 17 at 11, 28-29.)

Defendant's argument is not without support. See, e.g., In re Sonic Corp. Customer Data Sec. Breach Litig. (Fin. Insts.), No. 17-md-2807, 2020 WL 3577341, at *6 (N.D. Ohio July 1, 2020)

---

[5] There are differing view on analysis of the pleadings and the fact that the exact nature of Defendant's security measures is likely known only to Defendant at this point in the litigation. See Hummel v. Teijin Auto. Techs., Inc. No. 23-cv-10341, 2023 WL 6149059, at *5-7 (E.D. Mich. Sep. 20, 2023). This court agrees with the general proposition that "[n]othing in Iqbal indicates that th[e] standard should be relaxed in data breach cases, nor in any of the multitude of cases where there is an asymmetry of information between plaintiff and defendant." Id. at *7. However, "the Twombly plausibility standard . . . does not prevent a plaintiff from pleading facts 'upon information and belief' where the facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible." Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010) (citation omitted); Innova Hosp. San Antonio, Ltd. P'ship v. Blue Cross Blue Shield of Ga., Inc., 892 F.3d 719, 730 (5th Cir. 2018) (same); Ahern Rentals, Inc. v. EquipmentShare.com, Inc., 59 F.4th 948, 954 (8th Cir. 2023) (same); see also Kareem v. Haspel, 986 F.3d 859, 866 (D.C. Cir. 2021); Menard v. CSX Transp., Inc., 698 F.3d 40, 45-46 (1st Cir. 2012).

("While the FTC and other courts have interpreted [the FTC Act's] terms to apply to data security requirements, the statute's actual terms do not lay out positive, objective standards that, if violated, could give the standard for a negligence per se claim under Oklahoma law." (footnotes omitted)). But there is a "split on whether the FTC Act can serve as the basis for a negligence <u>per se</u> claim in the data breach context." <u>In re Blackbaud, Inc.</u>, 567 F. Supp. 3d at 684 (collecting examples). The variations in courts' holdings on this point "appear to stem from differences in the standards for negligence <u>per se</u> claims under the laws of different states." <u>Id.</u> at 684. Thus, the issue here turns on whether the FTC Act would satisfy North Carolina's standard for negligence per se.

"In North Carolina, a plaintiff establishes negligence per se where they show that the defendant violated a 'public safety statute,' the plaintiff was a member of the class intended to be protected by the statute, and the plaintiff suffered harm due to defendant's violation thereof." <u>Capiau</u>, 2024 WL 3747191, at *10. To support its argument that the FTC Act is not a "public safety statute," Defendant points to a single, North Carolina Superior Court case, <u>Weddle v. WakeMed Health and Hospitals</u>. (Doc. 17 at 29 (citing <u>Weddle</u>, No. 22-CVS-13860, 2023 WL 8369786, at *2 (N.C. Super. Dec. 4, 2023).) There, the trial court reasoned

- 37 -

that the FTC Act was not a "public safety statute" because it is a statute that "targets unfair methods of competition and unfair or deceptive trade practices," rather than a statute "designed for the protection of life or limb." Weddle, 2023 WL 8369786, at *2. In so holding, the Weddle court applied a definition of "safety statute" from a 1994 state supreme court case. See id. ("As our Supreme Court has explained, '[a] safety statute or ordinance is one designed for the protection of life or limb and which imposes a duty upon members of society to uphold that protection.'" (quoting State v. Powell, 336 N.C. 762, 768-69, 446 S.E.2d 26, 29 (1994)). However, the North Carolina Supreme Court and state appellate courts appear to recently define "safety statute" more broadly. For example, Stein v. Asheville City Board of Education defines a "public safety statute" as "one imposing upon the defendant a specific duty for the protection of others." 360 N.C. 321, 326, 626 S.E.2d 263, 266 (2006) (cleaned up) (quoting Lutz Indus., Inc. v. Dixie Home Stores, 242 N.C. 332, 341, 88 S.E.2d 333, 339 (1955)); see also Parker v. Colson, 266 N.C. App. 182, 186, 831 S.E.2d 102, 105 (2019) (same).

While this court must defer to the North Carolina state courts' authoritative interpretations of state law, it does not find the Weddle court's decision regarding the FTC Act to be

- 38 -

binding interpretation for several reasons. First, a trial court's decision does not constitute binding precedent on this court. Second, no other North Carolina court has addressed the question. Third, the differing definitions of "public safety statute," and the Weddle court's application of an older, narrow definition, raises some question in light of more recent observations. Finally, this court finds instructive the reasoning of the district court in Capiau v. Ascendum Machinery, Inc., which applied the more recent, broader definition of "public safety statute" to find that the FTC Act can be the basis for a negligence per se claim under North Carolina law. 2024 WL 3747191, at *10. There, the court reasoned:

> The FTC Act . . . impos[es] upon regulated businesses a duty to avoid "unfair or deceptive acts or practices in commerce." And while it is a closer call, the [c]ourt finds that [p]laintiff is a member of the class (individuals engaged in commerce) the FTC Act exists to protect — when an employee exchanges their labor and PII for employment compensation, they are undoubtedly engaged in commerce and therefore protected by the FTC Act. Whether Defendant's data security measures and related representations amount to an "unfair or deceptive" act or practice remains to be seen.

Id. For these reasons, this court finds that, by alleging that Defendant violated the FTC Act, Plaintiffs have met the minimal standard of plausibility required to survive a 12(b)(6) motion. See id.

- 39 -

Accordingly, this court will deny Defendant's motion to dismiss Plaintiffs' negligence and negligence per se claims; however, this finding is without prejudice to further consideration on a more developed record.

### 2. Breach of Implied Contract

Next, Defendant contends that "Plaintiffs' breach of implied contract claim fails because Plaintiffs do not (and cannot) allege they reached any agreement on specific data security practices to safeguard the personal data provided to [Defendant] in connection with Plaintiffs' employment." (Doc. 17 at 11.) Defendant's argument is unpersuasive because Plaintiffs need not allege the existence of an express "agreement on specific data security practices" for their breach of implied contract claim to survive Defendant's motion to dismiss.

"To allege breach of contract in North Carolina, a complaint must allege facts sufficient to prove that (1) there was a valid contract between the parties and (2) that the defendant breached the terms of that contract. Superior Performers, LLC v. Carey, 716 F. Supp. 3d 373, 378 (M.D.N.C. 2024). Under North Carolina law, "a contract implied in fact arises where the intent of the parties is not expressed, but an agreement in fact, creating an obligation, is implied or presumed from their acts," and "[s]uch and implied contract is

- 40 -

as valid and enforceable as an express contract." Creech v. Melnik, 347 N.C. 520, 526, 495 S.E.2d 907, 911 (1998). In data breach cases such as this one, courts have found similar claims of breach of implied contract claim to survive Rule 12(b)(6) without plaintiffs having alleged the existence of a specific agreement on data security. See, e.g., Capiau, 2024 WL 3747191, at *11; In re Marriott, Inc., 440 F. Supp. 3d at 485-86 (applying Oregon law similar to that of North Carolina's and finding that an implied contract regarding data privacy existed between a customer and hotel). For example, in Capiau, the court found that, absent allegations of a specific agreement to protect his PII, a plaintiff's breach of implied contract claim under North Carolina law survived a defendant's motion to dismiss because such an agreement was implied by the employment agreement between the plaintiff and defendant. 2024 WL 3747191, at *10-11. There, the court reasoned: "As a condition of [p]laintiff's employment, [d]efendant required [p]laintiff to provide to [d]efendant his PII. The requirement that [p]laintiff provide [d]efendant with his PII vested in [d]efendant an implicit obligation to adequately safeguard plaintiffs' PII." Id. at *11. The Capiau court further reasoned that, even absent an employment contract, the plaintiff's claim would have survived because courts have recognized an implied contractual

- 41 -

obligation to protect PII in more attenuated relationships such as that between customer and merchant. See id. (citing, e.g., Anderson v. Hannaford Bros. Co., 659 F.3d 151, 159 (1st Cir. 2011)).

Here, as in Capiau, Plaintiffs have alleged an employment relationship between Midkiff and Defendant, a condition of which was Midkiff's provision of her PII to Defendant. (See Doc. 12 ¶¶ 62-64, 68.) Such a factual allegation creates the reasonable inference that an implied contract to protect that PII exists. See Capiau, 2024 WL 3747191, at *11. Further, Jones' provision of her PII, including her Social Security number and financial account information, is sufficient, even in the absence of an alleged employment contract. See id.; see also Anderson, 659 F.3d at 159 ("When a customer uses a credit card in a commercial transaction, she intends to provide that data to the merchant only. Ordinarily, a customer does not expect — and certainly does not intend — the merchant to allow unauthorized third parties to access that data. A jury could reasonably conclude,

therefore, that an implicit agreement to safeguard the data is necessary to effectuate the contract.").[6]

Accordingly, this court will deny Defendant's motion to dismiss Plaintiffs' breach of implied contract claim.

### 3.   Unjust Enrichment

To prevail on their unjust enrichment claim, "a plaintiff must show that (1) benefits were conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." Capiau, 2024 WL 3747191, at *12 (cleaned up) (citation omitted); see also Booe v. Shadrick, 322 N.C. 567, 570, 369 S.E.2d 554, 556 (1988) (holding that "a party must have conferred a benefit on the other party," "[t]he benefit must not have been conferred officiously," and "the defendant must have consciously accepted the benefit"). Defendant argues that Plaintiffs' unjust

---

[6] Defendant relies upon a recent opinion by a panel of the Fourth Circuit to argue that alleging Defendant accepted Plaintiffs' PII is not enough to show the existence of an implied contract to protect that PII. (See Doc. 17 at 29–30 (citing and discussing J.R. v. Walgreens Boots All., Inc., No. 20–1767, 2021 WL 4859603 (4th Cir. Oct. 19, 2021)); Doc. 20 at 16–17 (same).) Defendant's reliance on that case is misplaced because the panel decision on that point is limited to circumstances where "there is no allegation that [defendant] was hacked or otherwise disclosed the PII to any outside party." 2021 WL 4859603, at *5 n.9.

- 43 -

enrichment claim falls short because Plaintiffs fail to allege that Defendant "wrongly retained a benefit" from the accepting and keeping Plaintiffs' PII. (Doc. 17 at 38-40.) In other words, Defendant contends that Plaintiffs' allegations fail to sufficiently establish the first and third elements of their claim — the "benefit" that was conferred by Plaintiffs and received by Defendant and how Defendant's acceptance or retention of that benefit was inequitable. (See id.)

Defendant's argument that Plaintiffs failed to sufficiently allege a "benefit" is unconvincing. In the data breach context, courts have held that "an unjust enrichment claim can lie even where the benefit conferred is not monetary" and that a defendant "cannot be heard to argue that [d]efendant was indifferent to [p]laintiff's provision of PII, since such provision was a condition of [p]laintiff's employment." Capiau, 2024 WL 3747191, at *12. Defendant's argument on "inequity" is similarly unconvincing. Where a defendant accepts the benefits accompanying a plaintiff's PII without implementing safeguards adequate to protect that PII, the defendant accepts and retains that PII, and the benefit thereof, in inequitable circumstances. Id.; Gordon, 2025 WL 936415, at *16.

- 44 -

Accordingly, this court will deny Defendant's motion to dismiss Plaintiffs' unjust enrichment claim.

### 4. Breach of Bailment

Next, Defendant argues that Plaintiffs' breach of bailment claim fails because Plaintiffs' allegations do not establish a bailor-bailee relationship. (Doc. 17 at 11, 32-33.) Under North Carolina law, "[a] bailment is created when a third person accepts the sole custody of some property given from another." State v. Storm, 289 N.C. App. 257, 261, 888 S.E.2d 670, 673 (2023) (internal quotations omitted) (quoting Barnes v. Erie Ins. Exch., 156 N.C. App. 270, 273, 576 S.E.2d 681, 683 (2003)). Traditionally, the object of a bailment is a specific item of tangible personal property. See id. Further, North Carolina case law generally holds that the object of a bailment must be nonfungible because the bailment "usually involves a return of the exact property" transferred between the bailor and bailee. See id.

Defendant argues that Plaintiffs fail to allege a bailment relationship because their PII does not constitute tangible, nonfungible personal property that is subject to bailment. (See Doc. 17 at 32-33.) In other words, "PII cannot serve as a basis for breach of bailment." (Doc. 20 at 17.) Plaintiffs respond that "PII could properly be the subject of a bailment under

- 45 -

North Carolina law" because the North Carolina courts have held

that, in certain circumstances, money and checks can be the

object of a bailment. (Doc. 19 at 17-18) This court finds

Plaintiffs' argument unconvincing.

The cases Plaintiffs rely upon emphasize that money and

checks can be the object of bailment only when they act as

tangible, nonfungible personal property. See Storm, 289 N.C.

App. at 262, 888 S.E.2d at 674. In State v. Storm, the state

appeals court discussed these relevant precedents:

> In State v. Eurell, our Supreme Court stated that "one
> who receives money for safe keeping . . . is a bailee if
> under the agreement of the parties he is to return the
> identical money received . . . ." And, in State v.
> Minton, we held — without discussion — that a bailor-
> bailee relationship existed where checks were provided
> to the defendant to, in turn, pay a third party. However,
> we have also reiterated the principle that whether a
> bailment relationship has been created with respect to
> money depends on whether the agreement requires the use
> of "exact funds" as opposed to treating the money as
> fungible.

Id. (alteration omitted) (emphasis added) (citations omitted)

(first quoting State v. Eurell, 220 N.C. 519, 519, 17 S.E.2d

669, 670 (1941); then citing State v. Minton, 223 N.C. App. 319,

322, 734 S.E.2d 608, 611 (2012)). Thus, Storm held that a

bailment "usually involves a return of the exact property . . .

and, where narrow exceptions to that rule exist, they exist for

arrangements in which the bailee exercises control in a specific

- 46 -

enough manner so as to still resemble traditional bailment." <u>Id.</u> at 263, 888 S.E. 2d at 675.

Plaintiffs contend that "North Carolina law does not foreclose intangible property — like money or data — from being bailed." (Doc. 19 at 19.) However, Plaintiffs' contention does not fully square with <u>Storm</u>, and they fail to convincingly argue or allege how Defendant exercised control over their PII in "a specific enough manner so as to still resemble traditional bailment." <u>Storm</u>, 289 N.C. App. at 263, 888 S.E. 2d at 675. Further, no North Carolina court has ever held that PII can serve as the object of a bailment.

Accordingly, this court will grant Defendant's motion to dismiss Plaintiffs' breach of bailment claim.

> **5.** **<u>North Carolina Unfair & Deceptive Trade Practices Act</u>**

To state a claim under the Unfair and Deceptive Trade Practices Act ("UDTPA"), N.C. Gen. Stat. § 75-1.1 <u>et seq.</u>, "a party must establish that (1) the defendant engaged in an 'unfair' or 'deceptive' act or practice; (2) the act was in or affecting commerce; and (3) the act injured the plaintiff." <u>Rutledge v. High Point Reg'l Health Sys.</u>, 558 F. Supp. 2d 611, 619 (M.D.N.C. 2008) (citing N.C. Gen. Stat. § 75-1.1; <u>Dalton v. Camp</u>, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001)). Defendant contends that Plaintiffs' UDTPA claim fails because (1)

- 47 -

Plaintiffs do not allege that Defendant's relevant conduct was "in or affecting commerce," (Doc. 17 at 35-37), and (2) Defendant's alleged conduct does not constitute "unfair or deceptive trade practices," (id. at 34-35, 37).

Trial courts have regularly found similar UDTPA claims arising from similar data breaches to survive similar Rule 12(b)(6) motions. See, e.g., Capiau, 2024 WL 3747191, at *13 ("To the extent that [p]laintiff's NCUDTPA claim pertains to [d]efendant's allegedly unfair business practices — i.e., Defendant's failure to implement and maintain adequate cybersecurity measures and warn [p]laintiff of the breach — [d]efendant's motion will be denied."); McCreary v. Filters Fast, LLC, No. 20-cv-595, 2021 WL 3044228, at *8 (W.D.N.C. July 19, 2021) (summarily denying Rule 12(b)(6) motion with respect to plaintiff's UDTPA claim, among others); Solomon, 2023 WL 1359662, at *5 (same). However, this court is not aware of, and cannot locate, precedent from the Fourth Circuit or the North Carolina Supreme Court that clarifies the "aggravating circumstances" under which a defendant corporations' conduct leading up to or following a data breach amount to "unfair" or "deceptive" acts or practices. See Exclaim Mktg., LLC v. DirecTV, LLC, 134 F. Supp. 3d 1011, 1022-23 (E.D.N.C. 2015) ("[T]he UDPA only applies where egregious or aggravating

- 48 -

circumstances are proved." (citing Dalton, 353 N.C. at 657, 548 S.E.2d at 711). Further, at the present stage of the proceedings, the factual record is relatively sparse as to Defendant's practices in collecting, storing, and using Plaintiffs' PII and Defendant's actions in response to the data breach — facts that are "peculiarly within the possession and control of the defendant," see Arista Records, 604 F.3d at 120. Accordingly, this court determines that it is appropriate to exercise its discretion under Federal Rule of Civil Procedure 12(i) to defer resolution of Defendant's motion to dismiss Plaintiffs' UDTPA claim. See Fed. R. Civ. P. 12(i); Design Res., Inc. v. Leather Indus. of Am., 900 F. Supp. 2d 612, 621 (M.D.N.C. 2012).

## V.   CONCLUSION

For the foregoing reasons,

**IT IS THEREFORE ORDERED** that Defendant's Motion to Dismiss, (Doc. 16), is **GRANTED IN PART** and **DENIED IN PART**. The motion is **GRANTED** as to Plaintiffs' breach of bailment claim, and that claim is hereby **DISMISSED**. As to Plaintiffs' other claims, Defendant's motion is **DENIED WITHOUT PREJUDICE**. A ruling on the legal sufficiency of Plaintiffs' UDTPA claim will be deferred to the next dispositive stage of litigation pursuant to Fed. R. Civ. P. 12(i).

- 49 -

This the 30th day of March, 2026.

_____
United States District Judge

- 50 -

Case 1:24-cv-00858-WO-JEP    Document 22    Filed 03/30/26    Page 50 of 50